We're going to move now to Appeal 25-2604, Paul Johnson v. Ridge Tool Manufacturing Company, Inc. We're going to begin with oral argument toward the appellant from Mr. Cronow. Thank you. I support counsel, Mr. Johnson. Thank you, Your Honor, for hearing this case. It's a privilege and opportunity for you, so thank you. To start, you know, this is a straightforward case. We have a drum machine that has a spinning cord, 285. And the defendants are at higher pay stages I won't talk about. The way they decided to protect the end user is to literally put the safety of the end users in their own hands. Right? That's the starting point. And we have two experts, Ed Jones, a certified engineer, seven states, 30 years, Cynthia Rondo for NASA, who's on gloves for NASA, whose opinions were barred under the first period for Jones was no testing. And the case law is clear under the precedent at this point. Anderson, there is no need to retest a design that's compromised or that the defendant already implements. And what was the facts in this case? There was a guard that was an optional accessory for this drum machine that would protect the end user from the spinning cable, but they could still steer and direct the cable through the plumbing. Anderson is clear. That's not retested, but district judge in this case struck Chad Jones' opinion, because he didn't test a design that was already available. Well, I mean, let me ask you about that. The front guard hose that Ridge Tool offers as an optional product is not the same as the coil protection device that Chad Jones, you know, suggested in his report. Is that right? Correct. It's a rubber tube versus like a coil. Chad Jones' market uses it like a sling, right? A tension machine. This is a rubber hose, which again, issue of fact, what's a better design? The fact of the matter is even those designs guard against someone's hand getting wrapped into it. So we're dialed in on exactly the portion of the Jones report that you believe should survive 702. That's the engineering analysis and discussion and the 5 conclusions, which are found on pages 89 to 96 of the Jones report. Is that correct? Yes. This is a very lengthy report, 200 pages or so, but just so we're clear, that's the portion that should be encapsulated. Correct, Judge. I mean, there's way more to this than we've talked about. We've been regarding this interlock, but again, the issues raised by the court don't go to admissibility. They go to weight, cross-examination, let the jury decide whether what Chad Jones says is reasonable, proper, or this machine, this industry, under Anderson, should not just be flung out, barred from testing. You have a dog, it's a flexible test. You go up to the dog and say, can you go better than anyone? You come down to basically one factor. Was this tested by the inspectorate? In all the case law, it refutes that. Ironically, there was no opinion, no finding that Chad Jones was unqualified. And in fact, the report said that Chad Jones was qualified. So once he's qualified, she took no issue with his methodology. It's a professional engineer applying fancy standards, which again, standard methodology across not only engineering, but Cynthia Rondo relies on that as human factors actually. The law is clear, the court was able to agree with the conclusions. It's just, is the methodology reliable? Clearly it is in this case, but to strike the entire opinion from lack of testing, multiple other opinions that he gave to go to those other opinions, defies Daubert, defies Anderson. And the court doesn't even rely or say to or acknowledge Anderson, which obviously subsequently they saw that came down from this court after this case was approved. Why, I obviously don't know, but that's been shown in the legal sense. Next, if I could, I'll move to Cynthia Rondo. Let me ask you one question about Jones. Do you agree that without Jones, the design defect claims cannot survive because he was the one opining about a reasonable danger? In Illinois, I would say no, because there's the consumer expectation test and there's a risk utility test. Now, it's kind of sloppy as far as which test applies. Some courts say, well, once risk utility comes in, then the consumer behavior becomes a factor. Some courts say, you know, plaintiff can submit. I think the design in this case is so simple. I think because the defendant already had, we classify as a guard, right? I'm sure you've noticed the defendant won't classify as a guard. It's a front guy who holds a symphony. But their warning says, he's a guard. The only thing that could be is the front guy. Because of those factors, the weakness, the simplicity of this product, I think it could be submitted without an expert on the consumer expectation test, which is, you know, or dismiss the claim saying there's no experts. What other evidence was there in the record that the product as designed was unreasonably dangerous or failed to meet the consumer expectation test outside of the Jones report? Well, this Cynthia Rondo, I think clearly covers that up because if you were to literally follow the instructions, ones that it's messy because they're contradictory, but if you were to follow instructions, literally your arm could end up wrapped up. Isn't that really on the failure to warn thing that she's talking about, about those instructions? Yes. I mean, that's also part of strict liability, right? You know, in case less clear to not only is it failure to warn, but failure to, I guess, have warnings that don't have gaps, right? So, but again, consumer expectation, if you follow the warnings, the warning says, does it ever exist? Does that get to the jury without stupidism? So, Ms. Rondo, you know, the big issue in this case with Ms. Rondo is the court basically said, well, because Mr. Johnson didn't read the manual that was not tethered to the machine that his employer kept in a closet, you know, all of the opinions are all the same. And that is a too narrow approach of the issues in this case. And this is, again, the key in another case decided after the briefings, the end point talks about. You have a gap in instructions or you have inconsistent instructions, which we clearly have here, that is a strict product claim, failure to warn, liability. The whole failure to read the manual is at best a strict claim, some type of comparative fault that doesn't apply strictly, right? They're not reading the manuals, not tethered. It's reasonable misuse that's on the fence. The biggest problem is, again, we have the label on the actual machine, right? That Mr. Johnson said he read. The label on that machine says, well, read the user manual. The problem is machines owned by an employer, kept somewhere by the employer. This manual is nowhere near to be hazard gloves that are being replaced from being used by other people, which again, goes back into Randall's opinion, not just the warnings, but how do you have a one size fits all glove, right? That wears out. That isn't, again, kept with the machine as your hierarchy of design to keep the end user safe. Again, you're literally putting the safety of the product in the end user's hand rather than guarding against it, which I think is a lot. And so, again, the warning says, use rigid gloves. It's a one size fits all. That's what Randall said. Gloves are provided in supposedly approved by Granger, sold to the machine. They're too big, right? Well, the machine also said, well, don't use a glove that's too big. What does that mean? Again, it doesn't do anything to tell the end user what is the proper right way to properly control, support, and gape, which is why guarding is so expensive. So Randall, NASA engineer, literally designed space gloves for NASA. Well, her opinion gets stricken because the manual hadn't been under, in the Anderson case, the other case decided, you know, that's totally improper from a developer position. You can go through the opinions and apply some analysis and discretion that didn't apply in this case. But, you know, the warning as a whole, again, when the label on the machine is incorporated in the user label, this, Randall says, is not going to apply to the end user. You can't understand it anyway. And it's terribly inconsistent. You have a failure of the warning system as a whole. So to focus only on the reading of the manual does not. I'm not sure I understand what that means. Sure. So Rondo provide the kind of warning that she thought should have been used? No, because the warnings weren't totally inconsistent. Don't do this, do this, don't do that. That doesn't prevent the expert from providing a proper warning. They could. It's very difficult to defeat something with nothing. No wonder, see under Hakim again, in this case, with this product, it's sold big box stores to consumers, but the test was weekend warrior. The team is clear that the jury can decide what is improper, where the failure took. In this case, it's mainly in a manual, not tethered to the machine found in a closet. Running short on time. So finally, this jumps to the last part, and that goes to the dismissal of the claim as a whole. Okay, so the court dismissed for not reading a manual that was physically inaccessible and substantially defective under the Hakim case. It's up to the jury to decide, not the court. It's a true fact. Right to your question, machine that rotates 185 revolutions per minute, sold at big box stores, Your Honor. No formal training, right? That's on the record. It's not a sophisticated industrial device to market to consumers and warriors. So a jury could find that the risk outweighed utility. A feasible guard existed, given the defendant's own optional accessories. The warning system was contradictory. The manual was inaccessible, which practically caused injury in this case. Under Hakim, that's enough for the jury. We reserve the rest of my time. Thank you very much, Mr. Kronhauer. We'll now move Mr. Bennett to you for oral argument on behalf of the appellee. Thank you, Your Honors, and may it please the court. To address at the outset, the first question that was asked today, the guide hose is definitely not the same as the alternative design that engineer Jones advocated for. He testified and put in his report repeatedly that the guide hose is different and insufficient. And to give direct citations to be responsive to the first question, it would be an A419 as his report where he says the guide hose does not meet the requirements that he has. And then in terms of his depositions where he says the guide hose is not the same as his alternative design or effective, that's at A696, page 218, 9-24 of his deposition. And he repeats that repeatedly throughout the next following pages. And so what that means is that the way this argument started out is there is no situation here like any other cases where the court has found that expert testimony was sufficient. The case is talking about taking Anderson as an example. What they say there is, well, you don't have to do physical testing. And one factor that shows that is the defendant has the exact same product that is the advocated for alternative design. And so we know it can be used and we know it's being used and we know it's being used safely. That's like the door in Anderson. Here, my client, Ridge Tool, does not have the same design that's being used that is just as effective, that people like, that can be used effectively, that has a safer situation. So this case is very, very, very different. What do we know on this record about the relative safety of the actual device and the proposed device? Sure. The relative safety of this is that they had no information about the safety of the proposed device. No, I asked what we know on this record, not what we don't know. Thank you. Do we know anything on this record? Page A350 of the joint appendix is the Jones's report, it's page 19 of it, where he acknowledges that the plaintiff in this case is the only reported incident with this model. And we know... Maybe my question isn't clear. There must be injury rates from machines like this. Do we know anything about... Maybe the injury rate turns out to be zero with the exception of this plant, but do we know that to be true? Yes, we know for this product. I am saying that... I'm not saying there's an injury rate for every product under the sun. They took discovery of the injury rate for this product and we have at A350 and A411 and 412 and A681, their expert acknowledges this is an injury rate of one despite this being on the market for a long time. And our expert, which is in our special appendix six, a 40-year master plumber, attached to our brief, special appendix six, says in 40 years he's never heard of this issue with this type of device. And so we know that if he looked at the data like they did at Anderson, he would be comparing... That doesn't sound like data. That sounds like a statement. I'm ignorant about the actual injury rate of machines like this. So you wouldn't think that the Occupational Safety and Health Administration would have data on this subject. Has anybody looked? I don't believe that there is data on this subject. And I would say that it's because, like our expert says, this just doesn't happen. But we do keep records of incidents and don't have them. And we do sell and have been selling this for many years. So the only evidence in the record is a very good safety record of our product. So if he wanted to do like the person did at Anderson and say, well, I've compared all the voluminous data that's out there from the manufacturer there, the Raymond, the forklift banker, which is one of the things that this court said was a reason why we could excuse the lack of physical testing. This expert didn't do that. And so I think if you're looking at this from a Daubert perspective, what we're looking for is in the absence of physical testing, which this court says is important, what else is there? And here there's nothing. He didn't look at the data like the person did in Anderson. He doesn't have a product that we make and sell that's coming out the same. He didn't design a guard as a prototype and put it on there and show that it could work. He didn't do any of the things like this court says in Cummings you need to do to make sure that it can be used and work safely with this. There's no exemplar put on the machine. If you look at other cases that talk about the idea that you can do calculations, he did no calculations. This is a case where not only is there a lack of physical testing, which is important, there's a lack of every single other item that could give reliability to the opinion that he's offering. He was left in the end to say, the only thing that I have is I can tell you that three other companies have this device. And for that one, we know the numerator fraction. We don't know the denominator. We actually have some indication that that would be a minority because there is ours and he admitted, and the district judge signed it to this, he admitted that there are many others. And I think if you add it up, there's about eight other companies that have it just like ours. So there are other companies with similar products, multiple models per company or some companies that just have our design. Other ones like the EEL has one of each, but the numbers when you add it up of what's in the record that the experts looked at would show that the approach that engineer Jones is advocating for is a minority position. And I'm trying to build out that fraction because the fraction ends up becoming material under the case law. You've got three as a numerator, you're indicating to us, we should look at all the expert reports plaintiff and defendant to come up with the denominator. Well, I'm not saying you have to go through and say that the district judge did look at that and said, if you're going to just rely on industry standard, you actually have to show me that you've done this to show that this is an industry standard. And she specifically notes in her memorandum and opinion order that he admits in his deposition that there are other ones. And we cite in our brief that there are at least eight other ones that have our design. So the evidence that I believe is before the district court and that review is that this is a not industry standard. And certainly he admits the expert admits this was put into commerce in 2012. He admits that he has no comparable design that did that in 2012. When we made this, he said in his deposition, he has no idea what the state of play was when we made this in 2012. So I think this is a case where when you look at it, the expert has a you don't have a prototype, you didn't design anything. And you're just going to say there's an industry approach out there. He says, well, the only thing I did was go on the internet and I found these three examples. And here's a picture of one and a drawing of one, but no evidence that that was actually the industry standard. And here, when we have a 19 page decision, I think the district court is clearly in the abuse of discretion and clearly erroneous type standard of review for this here, because she does go through all of these steps for this. She makes a finding that he doesn't support the idea that it's actually industry standard. And I think there's, I think it's clearly correct, if you were looking at de novo, but it's definitely not manifestly erroneous or clearly erroneous under the Anderson standard of review for that. Um, so when we look at, um, the, uh, failure to warn, you know, uh, Rando is the other expert, and she admitted a couple of things that I think are very important. If you, you know, if you look at her deposition, um, the depositions that both the experts gave, they acknowledged that this user manual that they talk about could not have affected what didn't happen here because he didn't read it in any way. And to the court's question about, had, did she propose some other alternative that we could look at in this situation? Council and of course said, no, she didn't do that, but she did admit that in her deposition that she didn't prepare any alternative to look at, uh, to show that our warning was somehow deficient. I think that's really important here because we have two things. We have a label on the machine and there's a picture of it in the appendix at, um, at 256 that specifically says, that specifically shows a picture of someone's hand getting caught in the, in the coil and says that cables can twist and, uh, catch body parts. And then specifically says to read the manual. And here he admits, the plaintiff admits that he didn't read the manual and that he did read the label that told him to do that. So we have a situation where we did warn about the cable catching. We did show a picture of the cable catching. We did direct them to the user manual. And I think Rando's failure, uh, Ms. Rando's failure to propose anything different is a real issue for them and means that summary judgment and the Daubert ruling are correct. Um, and in their reply brief to many, in many ways, I see it as attempting to have Rando, uh, uh, Ms. Rando support the engineering type opinions, but they were very clear in the district court that her only opinions were on the warnings issue. And the district court noted that, but at page, uh, 986 and 988 of their opposition to the Daubert, they specifically say her opinions are about warnings. The district court did not abuse its discretion in concluding that, uh, there were no opinions about the actual label that's on the machine and definitely didn't abuse its discretion or do something clearly erroneous and finding that, uh, this person knew about the manual and didn't read it or that the expert did not have a, uh, any suggestions on how to fix the warning. So when we look at this from our perspective, um, there have been a series of cases, um, that have evaluated what to do in the absence of physical testing and what people have looked at on whether you could get over the hump and the absence of physical testing are what else was done. And I think when you look at that, you see that it is always the case that something else needs to be done when you don't have any physical testing. And that is, uh, you know, looking at prototypes, prototypes, did you design something? Have you done some math calculations? Did you do some modeling here? This expert did nothing. And in fact, didn't do some extremely basic things like, you know, rent one of these and see how it worked. He has no, and he admittedly, he survived the qualifications challenge, but it's not a situation here where when you look at, did you do enough work? He can say, I've worked with these machines. He's never worked with the machines and his, uh, and he has no experience with this machine or anything else. And he didn't even try to use them in any way as part of this work in this case. So I think what we end up with here is the situation where there is no plus factor and there is no test and then there's nothing else. And he's left to say, I didn't do the scientific method. It's more of a qualitative thing, which is what the district court voted and said, well, there's three other ones that do this. And that was not enough for the reasons the district court found. And I, uh, this should be a firm in all respects, the end of the design claims and counts one and two can't survive without their expert testimony in the morning has no proof of causation and can't survive without this round of those things. So we would ask that it be affirmed in all respects. Thank you, Mr. Bennett. We'll move now, Mr. Cronauer back to you for rebuttal argument. Yeah, I agree. Well, it's much of a choice, but let me start with you. The other instances that you asked, this is, I'm not going to use this majority, but this is the game that's playing. Are there other machines? I got bigger machines. I've got smaller machines. Yes. So the issue becomes that a proper lesson, which is an issue for evidence and admissibility of emotions, not summary judgment. All these issues being raised are not in this room. I asked your adversary what the record showed about relative error rates. And he said roughly nothing. Do you disagree with that? There are other, other injuries involving this style machine. Is it the 60 not asking whether there were I'm asking about relative error rates that Jones said that there are three manufacturers that include the kind of guard, the plenty of blocks. So you can figure out how often those machines injure their users. And it looks like there are about nine manufacturers that do not offer such guards and we can figure out the injury rate. So those users is that information in the Okay. Again, to go back to that part of the discovery was you're going to lay a foundation. Does this company have a framework in place to determine compliance injuries? They didn't have that in this case. Someone could call and there's a line. Someone could complain. It doesn't get documented. Documented doesn't mean anything. So again, torque also part of the ability is to create certain liabilities past the cost of a unsafe device back to the company, not the end user. So in this situation, if you don't keep good data, just incentivize the company to maintain bad data. So when it comes up on the field, there is no error rate. There's no injury rate. It goes back to when the market has an alternative design that's been tested, that's open. When ASL is clear, you don't have to retest. You don't have to reach out, for example, to determine where you still advise. There's no case law that states or establishes market share determined by more likely than not standard of companies out there using it, right? Again, that's spotter for cross, whether it's four, whether it's eight, whether it's nine, whether it's two. Titanic, that's the industry standard at the time for lightweights. Is that reasonable? No. The history tells us no. But the issue is if the standard becomes what does the industry do by progress of evidence, market share has no incentive to move because they're policing themselves, right? That's the problem to the jury. That's why it's an improper taking away from the jury. We asked in case we remanded back. Again, putting the guard aside, still have the glove. The one size fits all of them. It's replaced, wears out, and different gloves get put in. That is a bad design. Randall covers that. And to just flat out because of the warnings, which couldn't have been read because they weren't able to machine because the employee had them in a closet. They have their keys. They have gaps and inconsistencies. They live to instruct, which is a stupid liability. So with that, I will yield. If you have any questions, of course, thank you for your time, your honors. Thank you, Mr. Kronhauer. Thank you, Mr. Bennett. The case will take an under advised.